90 So.2d 274

**S. S. HUNTER**

v.

**R. L. PARKMAN.**

4 Div. 836.

Supreme Court of Alabama.

May 24, 1956.

Rehearing Denied Nov. 1, 1956.

Paul J. Miller, Jr., and J. W. Brassell, Phenix City, for appellee.

Smith & Smith, Phenix City, Chauncey Sparks, Eufaula, and Marion Rushton and Rushton, Stakely & Johnston, Montgomery, for appellant.

STAKELY, Justice.

The appeal in this case is from a final decree in favor of one partner against his copartner on dissolution and settlement of partnership affairs. The litigation between these parties has been of long duration and has come before this court, in one

form or another on three former appeals, to which we will later refer in more detail.

The partnership was formed in 1946 between S. S. Hunter (appellant) and R. L. Parkman (appellee). S. S. Hunter owned a large tract of land (some 1200 acres) and some 150 cows. Houses and other structures suitable for dairy business had been erected by S. S. Hunter upon the land and he also owned some tractors, trucks and other equipment. R. L. Parkman had had long experience in the business of dairy farming and at the time was employed by Hunter. The partnership contract entered into by these parties was, in substance, that Hunter should furnish the land, houses and equipment for operation of the business together with a herd of not less than 150 dairy cattle, the herd to be kept up by him to that number by necessary replacements. Parkman was to live upon, supervise and manage the dairy farm and to furnish the labor necessary in the operation of the dairy business and the feeding of the herd. The contract was to run for a period of five years from January 1, 1946, upon the basis of an equal division of all profits derived from operation of the dairy farm, from the sale to outsiders of surplus crops grown upon the place and from all increase of the herd.

The initial phase of this litigation was the filing of a bill in equity by Parkman, as complainant, against Hunter, as respondent, seeking an injunction to restrain Hunter from interfering with and destroying the partnership business by harassing Parkman and his laborers and threatening to remove from the dairy farm equipment necessary to its operation. Thereafter the bill was amended seeking the appointment of a receiver. After hearing, relief in these respects was granted to complainant and respondent appealed to this court. Hunter v. Parkman, 250 Ala. 312, 34 So.2d 221. On that appeal we affirmed the decretal orders overruling respondent's motion to dissolve the injunction and appointing a receiver. In doing so we sustained the equity of the bill, construed the contract as one committing to complainant the right of control and management of the business and sustained the conclusions reached by the trial court on the evidence taken ore tenus. Further in that opinion we took account of respondent's answer to the effect that the contract was no longer in existence when the original bill was filed, that the partnership had been dissolved by acts and conduct of complainant and that all of the property belonged to respondent and he could do with it as he pleased. To this contention we answered that the contractual relationship could only be terminated by mutual consent of the parties or by decree of a court of equity. On rehearing we noted that respondent had, in the court below, moved for an order allowing supersedeas.

After affirmance on first appeal, supra, complainant again amended his bill, the general effect of which was to seek an accounting and recovery for his interest in the partnership and for damages and compensation for his loss caused by Hunter's effecting a dissolution of the partnership and violation of the contract by taking over the assets, effects and profits of the business to the exclusion of complainant. The trial court proceeded to hear the cause and render a decree on evidence taken ore tenus before him, declared the rights of complainant in respect to the several claims of complainant, found the amount due by respondent to complainant and rendered a personal judgment against respondent and in favor of complainant. Respondent Hunter appealed from that decree and our decision thereon is reported as Hunter v. Parkman, 254 Ala. 494, 48 So.2d 878, 881.

On this second appeal, supra, we did not pass upon the sufficiency of the bill—there being no decree as to this justifying an appeal or assignment of error—nor did we enter upon any consideration of the evidence. We did, however, set out the allegations of the bill in some detail as disclosing the nature of the claims made by complainant. We reversed that decree upon the ground that it was in conflict with the

settled rule that "one partner may not recover in an action against his copartner on account of matters growing out of the firm business, until there has been a settlement and a balance found due him", and that "Before there can arise a liability from one partner to another growing out of the partnership dealings, or for damages for reason of the failure of one to live up to his obligations under the contract in respect to its operations, there must be a partnership settlement, and if one partner has failed in that regard his liability is to the partnership and not to the partner, except as it may affect a final settlement which is only available in equity." We observed that the bill there nowhere sought a dissolution of the partnership and that the accounting made by the court itself, without a reference was not such as is necessary in such a situation. We suggested a reference to the register or special master, to be conducted in the manner provided by Equity Rules 79, 81 and 82, Code 1940, Tit. 7 Appendix. Further, in the opinion on that appeal we dealt with items of complainant's claims, pointing out items which might or might not be proper.

Thereafter complainant again amended his bill. A demurrer thereto was overruled and again the respondent appealed. We affirmed the decree overruling the demurrer. Hunter v. Parkman, 259 Ala. 596, 67 So.2d 797.

On return of the cause to the trial court a decree was rendered dissolving the partnership. Respondent answered this amended bill, making his answer a cross bill, setting up his contentions with respect to the termination of the business and his claims as to complainant's liabilities therefrom. Thereafter the court appointed a special master, directing him to proceed in accordance with the opinion of this court on second appeal, 254 Ala. 494, 48 So.2d 878, supra. In due course the special master made his report, to which respondent filed general and special exceptions, and the cause was submitted for decree. By the final decree exceptions were overruled and the report confirmed, with personal judgment in favor of complainant for the amount found due by the master. The present appeal is from that decree.

We have hereinabove set forth the history of this case in some detail. We have done so in order to show more clearly those questions which have already been decided and as well the effect of prior decisions upon the questions urged upon this appeal. Since the decree is no more than a confirmation of the master's report,—to quote from appellant's brief—"This case has finally come down to the question of the propriety of the so-called Master's Report."

The assignments of error are directed to several items of the master's account, to which exceptions were taken and overruled, to the fee allowed the master and to the decree as rendered.

The report of the master recites that a hearing was had at which all attorneys of record were present and submitted argument; "That the cause was submitted on the statements of account and evidence previously taken in writing, all of which, together with the pleadings and orders of court have been in my possession and have received careful and painstaking consideration. It was understood at the time of the hearing mentioned above that in the event the Special Master saw fit to do so, he would call for additional testimony, but additional testimony was not considered necessary." The report then states the conclusions that "S. S. Hunter first breached the partnership contract by failing or refusing to keep the dairy herd up to the 150 head named in the contract, and thereafter completed the breach of the contract by removing all of the cows. The evidence shows the respondent admitted that he refused to carry on his part of the contract." It concludes also that the improvements referred to in Item 9 of the account were made with the consent and approval of the respondent. It is recited that with permission of counsel for both parties, the results of the C. P. A. audits of the operating accounts of the

partnership having been established as correct to the special master's satisfaction, "were accepted as the basis of the account hereinafter stated, using the totals only and eliminating the itemization of the lengthy accounts in this report."

There follow several sheets in the form of an account, so arranged as to show a total column, for the partnership, a column headed S. S. Hunter and a column headed R. L. Parkman. It commences with the item of net income for 21 months of operations, "Per C. P. A. audit, not including labor," under the total column $19,308.83, and one-half that amount under each column of the individual partners. The remainder of the account consists of various items "Due by Hunter to the partnership" for removal of partnership property or other reason there assigned. At the end of the account a balance is struck showing the total assets or interest of the partnership as $59,544.57, Hunter's interest as $41,258.35 and Parkman's $18,286.22, with the following note:

"Balance due R. L. Parkman by Partnership $18,286.22

"The respondent, S. S. Hunter, having removed the assets of the partnership and forced its dissolution the partnership obligation falls on him and the said S. S. Hunter is therefore due the Complainant, R. L. Parkman the sum of $18,286.22."

The report of the special master concludes as follows:

"The foregoing statement of the partnership account is, in my opinion, self explanatory. However, it is not out of place to say that the amount charged as due under item # 13 would have been considerably larger if it had been possible to determine the exact number of cows in the herd throughout the entire 21 months of operations. There was evidence that the herd had been allowed to dwindle down to 111, but the average number on hand for the entire period could not be determined, consequently the profit per cow was determined on the assumption that 150 cows were in the herd. From the evidence before me I did not believe more accurate evidence on this matter could be obtained and therefore did not call for additional testimony. Attention is also directed to the fact that the possible income from the so called 'Revolving Certificates' for dividends on the sales of milk and rebates on feed purchased, was not taken into consideration in computing the charge under item # 13. It is possible that the income from this source would have been considerable but it was regarded as too vague, uncertain and indefinite to be considered in determining the value of the use of the cows due to have been furnished the dairy during the remaining 39 months of the partnership contract period. These explanations are made to make it clear that the questionable points were resolved in favor of the Respondent.

"As set forth at the bottom of the statement of partnership account, it is the conclusion of the undersigned Special Master that the partnership is due R. L. Parkman the sum of Eighteen Thousand Two Hundred Eighty Six and 22/100 Dollars ($18,286.22), and that the Respondent, S. S. Hunter, having removed the assets of the Partnership and forced the dissolution thereof, is due the said amount to the said R. L. Parkman, Complainant."

As a preliminary to the more specific questions raised by the assignments of error and argued in brief, we notice appellant's argument that for the first time during this litigation Hunter's side of the case is presented by his cross bill filed after the final amendment to the original bill. The burden of this cross bill is the contention that Parkman brought about the dissolution of the partnership when he obtained the preliminary injunction against Hunter and the appointment of a receiver to take

over the operation of the business. The prayer is that the court adjudge and decree the firm to have been dissolved by such actions on the part of Parkman and to ascertain the damages resulting to the partnership because of such dissolution by Parkman. We are unable to see how the cross bill has real bearing upon the questions now before us. In the first place, if the cross bill be treated as presenting any new issue, no evidence was brought forward or sought to be submitted by respondent after filing it. In the second place, the same contention was made by respondent at previous stages of the litigation. It is sufficient to refer to our opinion on third appeal, 259 Ala. 596, 67 So.2d 797, 799, supra, where, in considering the decree on demurrer to the bill as last amended, we said: "The equity of the bill is to declare a dissolution of the partnership and to have an accounting and settlement of it made in this Court. The injunction was in aid of that relief, *but was not itself a dissolution*. We are treating the bill as one for a dissolution and settlement. The injunction is in furtherance of that purpose. *The same is true as to the appointment of a receiver.*" (Italics supplied.) We may add, as before stated, there had been rendered a decree of dissolution, upon the ground of Hunter's conduct, prior to the filing of the cross bill.

As we approach a review of the decree here appealed from together with the report of the special master upon which it is based, we must keep in mind the presumption which obtains in favor of the original triers of fact upon evidence heard ore tenus. The evidence in this record is voluminous, covering some 250 transcript pages, consisting of the testimony of many witnesses, a mass of detailed accounting of the firm's operations, together with audits by accountants. We have read the evidence with attentive, painstaking care. While not without conflict, it tends rather strongly to show the facts and circumstances which we now briefly summarize.

In the beginning it seems to have been in the minds of both parties to build up the dairy farm into a high state of productivity and efficiency, with the hope and expectation of future profits. To this end Parkman brought several families to live and work upon the place and from time to time employed others, the wages of all of whom he paid. He and his employed help performed not only the work comprehended by the partnership contract; they devoted much time and effort to improve the place. Such improvements consisted of building and enlarging sheds and other structures, moving and rebuilding of fences and gates, permanently improving existing pastures, clearing and planting of new pasture lands. It appears that Parkman devoted his share of the profits very largely to more or less permanent improvements, over and above his contractual obligations, supporting his family with the earnings of his wife by outside employment. All such improvements were made with the knowledge and approval of Hunter, who, in encouragement thereof, at one time volunteered an additional allowance to Parkman to pay in part for excess labor. One tract of considerable acreage, which was so improved under Parkman's management and with his labor, was sold by Hunter, at quite a considerable profit in which neither the firm nor Parkman shared. That there was no objection to this sale at the time on the part of Parkman was apparently due to the harmonious relations then existing between the partners and the promise by Hunter to supply other acreage to replace that which was sold.

That Hunter failed to keep the herd up to the agreed number seems to be undisputed, his reason for not doing so being the matter in dispute. There is evidence that decreasing of the herd began about the middle of the second year of operations and that Parkman made repeated calls upon Hunter to supply more cows; that Hunter at first agreed to do so but finally declared that he would furnish no more cows, then

stating his purpose to terminate the partnership arrangement. There followed his removal of some equipment and some of the cows. When Parkman protested against these acts on the part of Hunter as being in violation of the contract and remonstrated, Hunter caused him to be arrested under a peace warrant and proceeded with the removal of property and assets of the firm. Though his attention was called to the contractual provisions, his attitude seems very clearly to have been that since the physical properties used by the partnership belonged to him, he could take control of them and exclude Parkman, without resort to the method of dissolution provided by the contract or to legal process. In pursuance of this attitude he succeeded first and last in the destruction of the business, thus precipitating the litigation which has followed.

There seems to be no doubt from the evidence that the dairy farm was enhanced in value during the operation of the partnership to some extent. There is a tendency of the evidence—some from apparently impartial witnesses—to show that the increase was as much as forty dollars an acre and that this was due to management and efforts of Parkman.

■ Recurring to the Master's Report, it is first contended that it is not a proper or legal partnership settlement, for that "There is no reference to any assets or liabilities of the partnership and no balance sheet of any kind"; that "no where is one of the partners, Parkman, charged with anything" (except as to one item of calves removed by him), but "the accounting seems to be an effort to find out how much Hunter owes the partnership." This contention is without merit. Since the partnership owned none of the physical properties, not even the cattle, the principal assets consisted in use and usufruct of the land, equipment and cattle. With such use, the firm was a going concern; without it, it was nothing. In dealing with this situation on second appeal, 254 Ala. 494, 48 So.

2d 878, we held that any legal claim which may be found to exist by the partnership against Hunter for damages resulting from his alleged conduct would be treated as an asset of the partnership. The accounting we think, conforms strictly to the requirements set forth in detail in our opinion, 254 Ala. 494, 48 So.2d 878, supra.

The items of the account fall into three categories. One, those due by Hunter to the partnership for removal of assets of the partnership, specified as a truck and wagon paid for by the firm, less depreciation for the time used by the firm; cows classified as scrubs or non-producers, after fattening at the expense of the partnership, showing their number and cost of fattening; fertilizer and feed paid for by dairy and removed by Hunter. Two, those due by Hunter for permanent improvements to the land and equipment over and above ordinary maintenance, specified as "fertilizer and lime paid for by partnership which should have been good for five years or more" at cost less $\frac{1}{5}$ for use of pasture for one year after improvement; for expense of vaccination of cows against Bangs Disease, not ordinary maintenance; for repairs to tractors for sale or trade-in, over and above ordinary maintenance; "for permanent improvements which it was the duty of Hunter to provide as part of dairy and pasture: clearing, seeding and otherwise improving land for pasture," less amount paid by him; for construction of tool shed and cow sheds, finishing barn, septic tanks and plumbing; for building gates, furnishing posts, moving and rebuilding $4\frac{1}{2}$ miles of fences, all in the nature of permanent improvements and not ordinary maintenance (this latter item constituting Item 9 of the account). Three, (Item 13 of the account) those "due by Hunter as a consequence of forcibly removing dairy cows and breaching partnership," specified as "The use of 150 cows for the remaining 39 months of the partnership period, computed on the basis of results for the period from January 1, 1947, through July 31, 1947, the period of active operations after the pas-

ture had been improved," as shown by C. P. A. audit, the net amount being shown (Item 14) after deduction of labor costs which Parkman would have been required to pay.

Considering the items of charges made against Hunter as due the partnership, we treat first those which we have classified as Category One. These items embrace the truck, wagon, fertilizer and feed, and cattle fattened at the expense of the partnership, which were removed by Hunter. All of these, we think, were proper items of the account. There is evidence tending to show the fact of removal and the value of each item. Though it appears that the truck was charged by the seller to Hunter individually, there is evidence that the partnership made the installment payments. In the matter of the removal of cattle fattened at the expense of the firm, the argument seems to be that this charge for feeding is improper since they were part of the milking herd and that this would involve a double claim, the one for feeding the cattle for milking purposes and second for fattening the same cattle. But these cattle, the evidence tends to show, were cattle classed as "scrubs or non-producers" and constituted an increase of the herd, fattening and sales of which inured to the benefit of the firm within the meaning of the contract.

As to the items which we have placed in Category Two, we think each was a proper charge in the accounting. We stated in our opinion on second appeal, 254 Ala. 494, 48 So.2d 878, supra, that claims on account of improvements would be proper only if made with the knowledge and approval of Hunter. We think that the evidence shows without conflict that Hunter did have knowledge of this excess effort on the part of Parkman and gave his approval thereto. The conflict was in respect to the resultant benefit to Hunter and the extent of his own contribution thereto. The conclusions as to this and the amounts arrived at by the special master in his account and report are amply sustained by the evidence before him. We are, however, in disagreement as to the treatment of that item shown in Item 9 of the account. The total cost of these improvements is put at $4,312, after deducting the amount paid by Hunter. Instead of placing this amount in the total or partnership column and one-half under the column of each partner, as all other items are treated, the report lists this as "Due R. L. Parkman by partnership $4,312.00." Standing alone or as a part of an accounting between the individual partners, this application might well be proper. But taking into account the evident fact that at the time these improvements were made—conceding that they were the result of Parkman's excess labor—it was contemplated by the partners that they would result in increased profits for the firm and taking further into account the final item of the account, the estimated loss to the firm in consequence of Hunter's withdrawal of assets, based upon the condition of the improved pastures, we are of the opinion that Parkman was not justly entitled to a credit of more than one-half the stated amount. The result is that Parkman's stated interest in the firm should be reduced by one-half of $4,312 or $2,156.

The item which we have placed in Category Three is, we think, a proper one. The sole objection to this is that it constitutes a speculative claim and we are cited to the single case of Bringham & Co. v. Carlisle, 78 Ala. 243, holding in effect that mere speculative profits, such as might be the probable result of an adventure defeated by the breach of a contract, the gains from which are entirely conjectural, and with respect to which no means exist of accounting, even proximately, the probable result, cannot be recovered. The same case, however, states the corollary of the rule that when profits form an elemental constituent of the contract, their loss the natural result of its breach, and the amount can be estimated with reasonable certainty, such as satisfies the mind of a prudent and impartial person, they are allowable as

damages; the requisite to their allowance being some standard, or established data, by reference to which the amount can be satisfactorily obtained. Following that case the Court of Appeals in Lide v. Birmingham Electric Battery Co., 22 Ala.App. 336, 115 So. 689, correctly stated the rule that in the event of the destruction or interruption of an established business, loss of profits may be recovered if the amount of actual loss is rendered reasonably certain by competent proof. In the matter before us there was such proof; a going concern, arrangement for sale of milk produced to the cooperative, an audit showing the results for a definite period by way of sales and expense of operation.

Other assignments of error relate to the fee allowed the special master and taxed as costs against respondent, appellant. The sole and only argument of appellant on these assignments is that there should have been no fee allowed the master, for the reason, in the language of the brief, that it was no report at all. This contention is clearly without merit for the reason, as we have shown above, the report was in proper form.

Finally, it is argued that the trial court was in error in rendering a personal judgment against the appellant. True, as contended by appellant in brief, one partner may not recover in an action against his copartner on matters growing out of the firm business, until there has been a settlement and a balance found due him. Hunter v. Parkman, 254 Ala. 476, 48 So.2d 878, supra. But when a partnership has been dissolved, a settlement had and a balance struck, assumpsit will lie for the amount so ascertained. Davenport v. Witt, 212 Ala. 114, 101 So. 887. In Kornman v. Raskin, 237 Ala. 490, 187 So. 709, we affirmed a decree awarding a personal judgment in favor of one partner against his copartner after dissolution and accounting of the partnership and a determination of the complaining partner's interest in the partnership. To hold as appellant seems to contend, that no personal judgment can be rendered in any event against one partner

in favor of his copartner, would be to remit the injured party to an empty victory. Here, the partnership is merely a name and devoid of any assets. Appellant has taken possession of all that had existed as partnership property.

We have thus responded to all of the questions raised by the assignments. It results as our judgment that the decree appealed from should be affirmed except as to that item of the account to which we have referred. It is therefore the judgment of this court that the decree appealed from be reduced in the amount of $2,156 so that the judgment here rendered in favor of R. L. Parkman against S. S. Hunter is in the amount of $16,130.22. The cost of appeal shall be divided equally between appellant and appellee.

Modified and affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.

On Application for Rehearing

STAKELY, Justice.

In brief for appellant on application for rehearing, it is argued that three additional reductions should be made in the amount decreed to appellee. We treat these in the order in which they are presented.

I.

It is claimed that there should be a further reduction of $1,455.77, being one-half of the accounts receivable item $2,911.54, shown as a partnership asset in plaintiff's Exhibit 4 "as owed on September 30, 1947, by Parkman to the partnership because of 'excess labor withdrawals' and other transactions."

Upon examination, the exhibit referred to is found to be one of several balance sheets constituting the C. P. A. audit of the partnership accounts during its active operation and the item referred to only one of several listed. The final tabulation of the audit itself takes this item into consideration in arriving at the net profit of the

business and the interest of each partner. As we pointed out in the original opinion, the Master's Report recites that, with permission of counsel for both parties, the results of the C. P. A. audit were accepted as the basis of the account stated by the Master. In stating the account the Master used the figures of the audit as to the net income of the firm and the interest of each partner therein, noting that labor is not included. Later in the account the Master charges Parkman with the full amount of withdrawals by Parkman for labor, viz., $11,583.72 "as per C. P. A. Audit." So that appellant seems clearly to have had the benefit of the item here claimed.

## II.

The second claim is thus stated in the brief:

"$6,760.00 being the value of Parkman's own personal services due under the partnership contract * * * but omitted from the Special Master's calculations in evaluating Parkman's claim for prospective profits during the 39 months the contract was to run after September 30, 1947, 169 weeks at $40.00 per week=$6,760.00."

This claim has reference to Item 13 of the Master's Account, captioned "Due Partnership by S. S. Hunter as a consequence of forcibly removing dairy cows and breaching partnership," and based upon the net value of the use of 150 cows for the remainder of the partnership term, "this value calculated upon the production of that number of cows during seven months (January through July, 1947), active operation of the dairy, in addition to the value of cattle raised." Item 14 captioned "Less amount Parkman would have had to pay for labor for the remaining 39 months of partnership period," computes the labor cost on the basis of 21 months active operations.

The figure arrived at is then deducted from Parkman's proportionate part of the calculated future income but not from Hunter's share.

The fallacy in appellant's claim in this regard is in assuming that, under the contract, Parkman was to be paid $40 per week for personal services by the partnership. It must be remembered that this is a contract of partnership and not one of employment. Parkman's interest or compensation was one-half the net profit of the firm, out of which he was to pay for all labor.

## III.

The third claim is stated in brief as follows:

"$4,055.61, deficiency in Parkman's prospective labor costs for the thirty-nine months of incompleted operations. The Special Master assumed a cost of $551.60 per month, but during the seven months (January–July, 1947) he chose as a base, Parkman's labor cost actually was $4,589.12 or $665.59 per month, the difference $103.99 x 39= $4,055.61."

This claim, like the one next above, is referable to Items 13 and 14 of the Master's Account.

In this claim we are of the opinion there is merit and we note that while this claim was brought to our attention on original submission, it was not presented with the exactness with which it is argued on the application for rehearing. Though the Special Master indicates on his account that he has used the results shown by the C. P. A. audit in computing this item of labor cost, it clearly appears that in computing profits (less labor) he used as a basis the result of the seven months operation in 1947, but in computing labor costs he used the results of the entire twenty-one months of active operation of the partnership. It appears from the report that this seven month period was used in computing profits because the pastures had then been improved. We are unable to see why, upon a careful consideration of the whole case, one period should have been used in computing profits and yet another period used for computing labor costs. If the results of the audit are to be made the basis for the one, they should be made the basis for

the other: The figure of $11,583.72, shown by the audit as the total of withdrawals by, or payments to Parkman for labor, covers a period of twenty-one months, that is, from January 1, 1946, to September 30, 1947. This figure was properly used as a charge against Parkman in stating the accounts of the partners for the period of actual operation of the firm. But the audit, in dealing with the particular period of January 1 to July 31, 1947, shows specifically a labor cost of $4,589.12, as contended by appellant. This would average $655.59 per month instead of $551.60 per month, resulting in the claimed deficiency of $103.99 per month which, multiplied by 39 months, yields $4,055.61.

It results that the decree, as originally rendered, should be further reduced by $4,-055.61, so that the judgment here rendered shall be $12,074.61. As thus corrected the decree appealed from will stand affirmed.

Opinion modified.

Rehearing overruled.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.